UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DALIA RASHDAN (MOHAMED), | Case No: C 10-00634 SBA |
| Plaintiff, | **ORDER PARTIALLY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| MARC GEISSBERGER, EUGENE LABARRE, AI B. STREACKER, FOROUD HAKIM, NADER A. NADERSHAHI, PATRICK J. FERRILLO, JR., LEIGH ANDERSON, JEFF MILES, DANIEL J. BENDER, LOLA GIUSTI, CRAIG YARBOROUGH, DOES 1-50, AND UNIVERSITY OF THE PACIFIC, | Docket 65 |
| Defendants. | |

Plaintiff Dalia Rashdan (Mohamed), a former dental student at the Dugoni School of Dentistry ("Dugoni School") at the University of the Pacific ("the University"), alleges that various instructors and administrators discriminated against her on account of her national origin (Egyptian). She alleges a federal claim for national origin discrimination under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, and various supplemental state law causes of action. The Defendants remaining in this action are the University and Drs. Marc Geissberger, Farouk Hakim and Lola Guisti. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).

The parties are presently before the Court on Defendants' Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56.  Dkt. 65.  Having read and considered the papers submitted and the record in this action, and being fully informed, the Court hereby GRANTS summary judgment in favor of Defendants on Plaintiff's Title VI claim.  The Court declines to assert supplemental jurisdiction over Plaintiff's remaining state law claims, which are hereby dismissed without prejudice.  See 28 U.S.C. § 1367(c)(3).  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.    BACKGROUND

## A.    FACTUAL SUMMARY

### 1.    Overview

Plaintiff is an Egyptian-American female.  Rashan Decl. ¶ 2, Dkt. 154.  In 1998, she obtained an undergraduate degree in biology from the University of the Pacific.  Id.  At some point thereafter, Plaintiff attended the Ain Shams University in Cairo, Egypt, where she earned a Bachelor of Dental Surgery degree in 2005 and a General Practice Residency certificate in 2007.  Id.  She then returned to the United States and enrolled in the Dugoni School's International Dental Studies ("IDS") program.  Id.  IDS is a two-year program designed for students, such as Plaintiff, who hold dental degrees from foreign schools, but lack the credentials to practice dentistry in the United States.  Bender Decl. ¶ 3, Dkt. 128.  A student who successfully completes the IDS program earns a Doctor of Dental Surgery ("DDS") degree and is eligible to sit for any state or regional dental board in the United States.  Id.  The two-year IDS program is a companion to the Dugoni School's three-year DDS general dentistry program.  Id.

Overall, the University has a total of approximately 536 students, comprised of about 150 students in each class of the general dentistry program and 20-22 students in each class of the IDS program.  Id. ¶ 6.  The IDS program includes students from Middle Eastern and Muslim countries, who timely and successfully graduate at the same rate as other students.  Bender Decl. ¶¶ 6, 35-38 and Ex. I; LaBarre Decl. ¶¶ 21-22, Dkt. 130.  In

both the IDS and general dentistry programs, Dugoni School faculty offers didactic (classroom lectures) and clinical instruction, the latter of which is provided at the school's on-site dental clinic.  LaBarre Decl. ¶ 8.

IDS students begin their clinical patient care in the third quarter of their first year. Bender Decl. ¶ 8.  Clinical instruction takes place at the Dugoni School's on-site clinic, where dental students practice their dental procedures on actual patients, obtain on-site training from faculty, and take faculty-supervised examinations.  Id.; LaBarre Decl. ¶ 8. Students must perform a required number and type of patient care procedures, as set forth in the Dugoni School's Graduation Guidelines, which are graded by faculty in the form of clinical tests and examinations.  Bender Decl. ¶ 10.  The Guidelines are provided to students at the beginning of each academic year.  Id. & Ex. C.  Students are specifically informed that they will be judged on their demonstrated clinical competency to practice dentistry.  Id. ¶¶ 11-14.

Dental students receive much of their clinical training during the last six months of their matriculation at the Dugoni School.  LaBarre Decl. ¶ 18.  There are ten clinical departments that must assess a student's performance in that particular department's work as part of the overall assessment of each student's competency to qualify for timely graduation.  Id.  Students are assigned step-by-step procedures to perform on patients.  Id. Typically, the final phases of a student's clinical instruction and evaluation are in restorative dentistry, followed by removable prosthetics.  Id.  The Department of Restorative Dentistry is one of the Dugoni School's largest clinical departments because much of the dental curriculum is taught within that department.  Geissberger Decl. ¶ 16. Dr. Geissberger is the Chair of the Department of Restorative Dentistry.  Id. ¶ 1.

Typically, in April of the student's planned graduation year, the Dugoni School issues warning letters to students at risk of not qualifying for timely graduation.  LaBarre Decl. ¶ 19.  However, a student may not receive a warning letter if, by April, they have not completed a sufficient amount of clinical work to determine whether they will pass or fail. Id.  In Dr. Geissberger's experience, some students, such as Plaintiff, choose to delay

taking the requisite twenty tests in restorative dentistry until "late in the game" because of their difficulty.  Geissberger Decl. ¶ 16.  As a consequence, these students leave too many of their tests to complete successfully in the limited time prior to graduation.  Id.

Students due for graduation are evaluated by the Student Academic Performance and Promotions Committee ("SAPPC"), which is composed of Dugoni School department heads.  LaBarre Decl. ¶ 10.  The committee meets each June to conduct final reviews of each student with the goal of reaching a collective judgment as to whether the student has satisfied all of the requirements to timely graduate.  Id.  This judgment includes evaluation of the student's clinical competency to treat patients and to determine, for those students who are not yet judged sufficiently competent, in what areas of dentistry the student should be extended for more training.  Id.  The SAPPC votes on each student individually and then recommends to the Dean which students will timely graduate and which students will be held over for further training and evaluation in the extended program.  Id. ¶ 11.  The Dean generally accepts the recommendations of the SAPPC.  Id.

### 2.      The "Third World Dentistry" Incident

The genesis of the instant lawsuit stems from an incident which occurred at the Dugoni School's clinic.  On January 29, 2009, Dr. Warden Noble, a Dugoni School faculty member, was adjusting a master cast for a dental clinic patient's crown.  Rashdan Decl. ¶ 14.  Dr. Noble expressed concern that part of the patient's tooth was high and therefore the crown would not seat properly.  Id.  Dr. Noble indicated to Plaintiff that when the patient came in, he would adjust the patient's tooth before seating the crown.  Id.

On March 5, 2009, the patient arrived at the dental clinic to have the crown seated.  Id. ¶ 15.  Since Dr. Noble was not present, Plaintiff attempted to seat the crown on her own, but was unable to do so.  Id. ¶ 28.  Plaintiff communicated the problem to another faculty member, Dr. Jessie Vallee, who, in turn, spoke to Dr. Geissberger, the head of the restorative dentistry department.  Id.  When Dr. Vallee returned, he told Plaintiff that Dr. Geissberger was upset that she had not told him that Dr. Noble was planning on adjusting

the patient's tooth.  Id.  Dr. Vallee then proceeded to adjust the patient's tooth and was able to seat the crown properly.  Id.

After the patient left, Plaintiff walked over to Dr. Geissberger to address the situation.  Id. ¶ 16; Leask Decl. Ex. FF ("Pl's Depo.") at 427:17-22, Dkt. 141-1.  Plaintiff attempted to explain to Dr. Geissberger that the idea of adjusting the patient's tooth to accommodate the crown was Dr. Noble's.  Id. at 427:23-428:21.  Dr. Geissberger then stated, "well, that's third world dentistry."  Id. at 429:24.  Plaintiff responded that Dr. Noble is the one who performed the dental work.  Id. at 430:1-2.  In turn, Dr. Geissberger said "it's still unacceptable."  Id.  At that point, the conversation ended.  Id. at 430:8, 430:13-14.

Later that same day, Plaintiff dropped by Dr. Geissberger's office to speak about their prior interaction.  Id. at 432:15-435:12.  Plaintiff explained that, as an international student and foreign dentist, she was offended by his "third world dentistry" comment.  Id.  Dr. Geissberger asked what country she was from.  Id.  When she said "Egypt," he said "that's not a third world country."  Id.  She responded "yes it is," and he, in turn, said "no, it's not" and that it was still "third world dentistry."  Id.  In an effort to "insult" Dr. Geissberger, Plaintiff retorted "yes it is, and I learned this third world dentistry in your first world clinic."  Id.  That was the last discussion Plaintiff had with Dr. Geissberger about his "third world dentistry" remark.  Id. at 438:18-22.  Plaintiff stated in her deposition that she understood Dr. Geissberger's use of the term "third world dentistry" to refer to substandard dental work.  Id. at 440:20-441:2.  In addition, she testified that Dr. Geissberger never made any disparaging remarks about Egypt, its people, customs, religious practices or ethnic traditions.  Id. at 306:13-307:9.

Plaintiff claims that at some point after her interaction with Dr. Geissberger, she encountered Dr. Faroud Hakim, Vice-Chair of the Department of Restorative Dentistry, in the dental clinic.  Id. at 301:2-7.  When he saw Plaintiff, Dr. Hakim, who is from Iran, said, "hey, what's up TW?"  Id.  After she gave him a puzzled look, Dr. Hakim added, "oh, come on, don't you know[?] … third world."  Id.  On a couple of occasions, he later greeted her

as "TW," though he also called her by her first name.  Id. at 301:7-20.  While Plaintiff claims she was not amused by being called "TW," she never told him or anyone else that she was offended by the nickname nor did she ask that he stop calling her that name.  Id. at 302:21-16.  In fact, in an email, dated May 29, 2009, Plaintiff thanked Dr. Hakim for making a special effort to assist her with a patient in the clinic, and signed the email, "Dalia Rashdan Mohamed *aka TW*[.]"  Id. at 291:22-294:3; Leask Decl. Ex. Z (emphasis added).  Like Dr. Geissberger, Dr. Hakim never made any disparaging remarks about Egypt, its people, customs, religious practices or ethnic traditions.  Id. at 304:11-305:10.

### 3.    Events Leading to Graduation

During her tenure at the Dugoni School, Plaintiff appeared to perform well in the didactic setting, but struggled with her clinical performance.  Rashdan Decl. Exs. P-S; LaBarre Decl. ¶¶ 12-16, 18-20; Bender Decl. ¶¶ 4-21, Exs. A-F; Yarborough Decl. ¶¶ 7-12, Dkt. 129.  Dr. Geissberger personally evaluated Plaintiff's clinical performance in the area of restorative dentistry and opined that she was "not ready to graduate on time."  Geissberger Decl. ¶ 10.  Both Dr. Geissberger and his departmental colleagues agreed that:  Plaintiff lacked clinical competency; she was incapable of effectively treating patients independently; and that the quality of her work was below those students who were recommended for timely graduation.  Id. ¶ 13; Hakim Decl. ¶¶ 14-16, Dkt. 132; Kenyon Decl. ¶¶ 4-7, Dkt. 133; Kachalia Decl. ¶¶ 4-10, Dkt. 134.[1]  In addition, by the time of the SAPPC meeting in June 2009, Plaintiff had not successfully completed all of the restorative dentistry competency tests that are uniformly required of all students.  Geissberger Decl. ¶ 16.  As a result of the shortcomings in Plaintiff's clinical performance, Dr. Geissberger recommended to the SAPPC that Plaintiff was not ready to graduate as scheduled in June 2009.  Id. ¶ 10.  Dr. Geissberger met with Plaintiff to explain his concerns.  Pl.'s Depo. at 64:24-65:3; 66:6-11; 244:16-245:4.

---

[1] Among those who reviewed Plaintiff's clinical performance are Dr. Faroud Hakim, Vice-Chair of the Department of Restorative Dentistry; Dr. Brian Kenyon, Associate Professor of Restorative Dentistry; Dr. Parag Kachalia, Associate Professor of Restorative Dentistry.  Hakim Decl. ¶¶ 1; Kenyon Decl. ¶¶ 1; Kachalia Decl. ¶ 1.

Plaintiff's clinical performance in the area of removable prosthetics also was deficient.  LaBarre Decl. ¶¶ 12-16; 18-20.  Department Chair Dr. Eugene LaBarre personally observed Plaintiff's clinical work in the area of removable prosthetics and concluded that she had not achieved the skills and competencies in removable prosthetics on the same level of those students whom the department of Removable Prosthetics had given positive evaluation for timely graduation.  LaBarre Decl. ¶ 12.  Based on his direct observations of Plaintiff, he opined that her unwillingness to accept constructive criticism from faculty was impeding her ability to improve.  Id. ¶¶ 12, 13.  He ultimately concluded that Plaintiff was not prepared to graduate on time with her class due to her unsatisfactory performance.  Id.  During her deposition, Plaintiff acknowledged speaking with Dr. LaBarre about her substandard performance and admitted that Dr. LaBarre's assessment of her work and his recommendation to extend her graduation was in no way discriminatory.  Pl.'s Depo. at 64:3-23; 248:9-249:20.

On June 10, 2009, the SAPPC met and evaluated all members of the Class of 2009, including Plaintiff.   The clinical performance of each student was discussed on an individual basis.  Giusti Decl. ¶ 10.  The SAPPC then voted on which students it would recommend to the Dean for timely graduation and which students would be held over for further training and evaluation in the extended program due to insufficient competency.  Id. ¶ 11; Bender Decl. Exs. D-G.  The SAPPC recommended to the Dean that Plaintiff and three other students be offered extended student status for additional competency training and evaluation, in lieu of immediate graduation.  Id.  The SAPPC identified the clinical areas in which each extended student was deemed to require additional training and evaluation.  Bender Decl. Exs. F, G.  The Dean accepted all four recommendations.  Id.

On or about June 10, 2009, Patrick J. Ferrillo, Dean of the Dugoni School, sent Plaintiff a letter notifying her that her graduation date had been extended due to issues with her academic performance.  Bender Decl. Ex. F.  The letter, in its entirety, reads as follows:

Dear Dalia:

I received a report from the Third-Year Student Academic Performance and Promotion Committee. The committee recommended to me that you be an extended student from the Class of 2009.

I have reviewed your academic performance and discussed it with the appropriate administrators. I agree with the decision of the Third-Year Student Academic Performance and Promotion Committee that you be maintained as an extended student as part of the Class of 2009, until you have demonstrated the following competencies that are required for your graduation.

1.  Meet with your Group Practice Administrator weekly to evaluate your progress and use of appropriate treatment protocol.

2.  Complete all fixed prosthodontic work in progress.

3.  Take and pass the following test cases and deliver all associated restorations. (These test cases are to be completed with selected restorative faculty and may not be completed during the school break: Tuesday/Thursday with Drs. Streacker and Geissberger.) Also you must meet with Dr. Geissberger weekly, in his office, Thursday evening from 5-6 to review your restorative work.

  a. 2 CIMOE

  b. 3 Prep and temp (Two must Include a buildup)

  c. 2 Final impression  d. 2 Amalgam Class II

4. Complete all removable prosthodontic work in progress including post-insertion care. Complete two new removable prosthodontic patient treatment plans starting from treatment planning through delivery where you complete all steps including laboratory procedures personally with one instructor. (These cases are to be completed with Dr. LaBarre and a second instructor to be determined by Dr. Peter Hansen. All new treatment must be completed after the start of the new quarter.)

5.  All associated periodontal, endodontic, and oral surgery treatment must be satisfactorily completed by you in an appropriate sequence.

6.  Comply with all clinic policies including attendance.

7.  Demonstrate professional and independent behavior.  This specific program has been established for you to reach competency levels required for graduation. I am convinced that this is in your best interest if you are to achieve your goal (and ours) of becoming a competent dentist. Hopefully, you will be able to complete this program as quickly as possible so that I can give you your diploma. I will look forward to that privilege.

Id.  The other extended students received similar letters on or around the same date.  Id. Ex. G.

Plaintiff embarked on the extended program training in removable prosthetics and restorative dentistry.   Bender Decl. ¶ 23.  She successfully completed the extended program training in removable prosthetics.  Id.  However, Dr. Geissberger, along with Drs. Ai Streacker, Kachalia, Kenyon and Hakim, evaluated her performance in restorative dentistry and concurred that she still had not achieved the requisite skills and competencies to independently treat patients.  Geissberger Decl. ¶ 25.  They found that Plaintiff was actually harming the patients due to her inadequate work; that she lacked fundamental concepts of clinical practice; and lacked the ability to self-evaluate her own dental work. Id. and Exs. W-EE.

On December 3, 2009, Dr. Geissberger sent Plaintiff an email conveying the Department of Restorative Dentistry's concerns regarding her lack of clinical competency in demonstrating the necessary skills to safely treat patients.  Id. Ex. W.  Among other things, Dr. Geissberger noted that during the last several weeks Plaintiff had demonstrated "no improvement" in her clinical skills, and that she had "damaged several teeth" of clinic patients.  Id.  After providing several specific examples of her poor work, Dr. Geissberger opined that Plaintiff had placed patients in danger, and therefore, he could not "in good conscience" allow her "to continue treating patients on the clinic floor."  Id.  To address the Department's concerns, Dr. Geissberger proposed that Plaintiff begin a remediation program on typodont exercises in both operative dentistry and fixed prosthodontics using models, as opposed to actual patients.  Id.  He projected that Plaintiff would be able to complete the remediation program within a quarter, if not sooner, at which point she would be able to return to the clinic for her test cases.  Id.

As a result of the feedback from the Department of Restorative Dentistry, the Associate Dean for Academic Affairs, Daniel Bender, called a meeting of the SAPPC to discuss the recommendations from the Department of Restorative Dentistry.  Geissberger Decl. ¶¶ 25-26 and Ex. W; Hakim Decl. ¶¶ 10-13, 17 and Ex. Y.  In an email, dated December 7, 2009, Dr. Nader Nadershashi notified Plaintiff of the special SAPPC meeting and indicated that Dr. Craig Yarborough had agreed to serve as her advisor at the meeting,

which was scheduled for December 10, 2009.  Id. Ex. Q.  On December 9, 2009, the day before the meeting, however, Plaintiff submitted a form Request for Absence from School.  Yarborough Decl. Ex. U.  The Dugoni School granted her request.  Id. ¶¶ 24, 26.  The SAPPC meeting proceeded as scheduled on December 10, with Plaintiff in abstentia.  Id. ¶ 6.

On December 22, 2009, Dr. Yarborough emailed Plaintiff to update her on the results of the SAPPC meeting held on December 10 and to communicate his and solicit her thoughts on a draft remediation plan.  Id. Ex. R.  He then transmitted a remediation plan proposal for Plaintiff's continued training and evaluation on December 30, 2009.  Id. Ex. S.  She did not respond to his proposal.  Id. ¶¶ 19-20.

On January 26, 2010, Dr. Yarborough informed Plaintiff that the SAPPC had accepted the remediation plan proposal which had been submitted by the Department of Restorative Dentistry.  Id. ¶ 22 and Ex. T.  He also informed Plaintiff of her right to appeal the plan to the Student Appeals Committee.  Id. ¶¶ 22, 25.  Plaintiff never appealed and did not return to the Dugoni School.  Id. ¶¶ 25, 26.

## B.    PROCEDURAL HISTORY

On February 12, 2010, Plaintiff filed the instant action alleging eleven claims for relief for: (1) conspiracy to violate her right to equal protection, in violation of 42 U.S.C § 1985(3); (2) violation of Title VI; (3) violation of the Unruh Act, Cal. Civ. Code § 51; (4) breach of implied contract; (5) breach of the implied covenant of good faith and fair dealing; (6) defamation; (7) tortious interference with a contract or advantageous business relationship or expectancy; (8) intentional infliction of emotional distress ("IIED"); (9) fraud; (10) negligent misrepresentation; and (11) negligence.  As party-defendants, Plaintiff named the University as well as various faculty and staff consisting of Drs. Geissberger, Ferrillo, LaBarre, Streacker, Hakim, Nadershahi, Leigh Anderson, Jeff Miles, Giusti and Craig Yarborough and Assistant Dean, Daniel Bender (collectively "Individual Defendants").

Defendants moved to dismiss the claims brought against the Individual Defendants; namely; the first claim for conspiracy under § 1985(3), the second claim under Title VI, the sixth claim for defamation, the seventh claim for tortious interference with contract, the eighth claim for IIED and the eleventh claim for negligence. Dkt. 10. On January 14, 2011, the Court issued its order granting the motion in its entirety. Dkt. 60. The Court dismissed Plaintiff's claims for tortious interference with contract and IIED with prejudice. However, the Court granted Plaintiff leave to amend her claims under § 1985(3), Title VI and for defamation. The Court also granted Plaintiff leave to amend to substitute the University as a defendant in her eleventh cause of action for negligence.

On January 24, 2011, Plaintiff timely filed her First Amended Complaint, Dkt. 61, which she then replaced with a Corrected First Amended Complaint on the same day, Dkt. 63. Plaintiff did not amend her second claim under Title VI, but purported to amend her claim for violation of § 1985(3), defamation and negligence. On February 8, 2011, the Individual Defendants moved to dismiss the § 1985(3) and defamation claims. Dkt. 65. Plaintiff did not oppose dismissal of the § 1985(3) claim (which she planned to further amend), but challenged the dismissal of certain aspects of her sixth claim for defamation. Dkt. 68.

On May 6, 2011, the Court issued its Order granting the motion to dismiss Plaintiff's first claim for violation of 42 U.S.C. § 1985(3) and sixth claim for defamation insofar as the defamation claim was based on statements made to the SAPPC. Dkt. 74. In the meantime, on April 15, 2011, during the pendency of the second motion to dismiss, Plaintiff filed a motion for leave to amend the pleadings. Dkt. 70. The parties subsequently stipulated to the filing of a SAC, which the Court approved on May 13, 2011. Dkt. 76.

On May 19, 2011, Plaintiff filed her SAC, which is the operative pleading before the Court. The SAC alleges nine claims for relief: (1) violation of § 1985(3) based on a conspiracy to deprive Plaintiff of her rights under the California Unruh Civil Rights Act ("Unruh Act"), California Civil Code § 51, et seq., and Title VI of the Civil Rights Act of

1964 ("Title VI"), 42 U.S.C. § 2000d; (2) violation of Title VI; (3) violation of the Unruh Act; (4) breach of contract or implied contract; (5) breach of the implied covenant of good faith and fair dealing; (6) defamation; (7) fraud; (8) negligent misrepresentation; and (9) negligence.

The University filed an answer to the SAC on June 17, 2011. The Individual Defendants, however, moved to dismiss Plaintiff's first claim for conspiracy under § 1985(3). On January 11, 2011, the Court granted the Individual Defendants' motion to dismiss Plaintiff's first claim for violation of § 1985(3), leaving only the University and Drs. Geissberger, LaBarre and Giusti as party-defendants in the action. The remaining Defendants now move for summary judgment. Plaintiff and Defendants timely filed their opposition and reply briefs, respectively. The matter has now been fully briefed and is ripe for adjudication.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The movant bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"

1   Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting in part Scott v. Harris, 550 U.S.

2   372, 380 (2007)).  "Only disputes over facts that might affect the outcome of the suit under

3   the governing law will properly preclude the entry of summary judgment. Factual disputes

4   that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  A

5   factual dispute is genuine if it "properly can be resolved in favor of either party."  Id. at

6   250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from

7   which a reasonable jury, viewing the evidence in the light most favorable to that party,

8   could resolve the material issue in his or her favor.  Id.  "If the evidence is merely

9   colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-

10   50 (internal citations omitted).  Only admissible evidence may be considered in ruling on a

11   motion for summary judgment.  Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

12   **III.    DISCUSSION**

13       **A.    TITLE VI**

14       Title VI provides that "[n]o person in the United States shall, on the ground of race,

15   color, or national origin, be excluded from participation in, be denied the benefits of, or be

16   subjected to discrimination under any program or activity receiving Federal financial

17   assistance." 42 U.S.C. § 2000d.  To prevail on a disparate treatment claim under Title VI,

18   the plaintiff must establish a prima facie case of discrimination by presenting evidence that

19   "gives rise to an inference of unlawful discrimination."  Cordova v. State Farm Ins. Co.,

20   124 F.3d 1145, 1148 (9th Cir. 1997).  Title VI claims are analyzed under the same test as

21   Title VII employment discrimination claims.  Darensburg v. Metropolitan Transp. Com'n,

22   636 F.3d 511, 519 (9th Cir. 2011) ("We look to Title VII disparate impact analysis in

23   analyzing Title VI claims.").

24       Under Title VII, a plaintiff can either establish a prima facie case under the burden-

25   shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or "simply

26   produce direct or circumstantial evidence demonstrating that a discriminatory reason more

27   likely than not motivated" the adverse action.  McGinest v. GTE Serv. Corp., 360 F.3d

28

1103, 1122 (9th Cir. 2004).[2]  When the evidence is direct, little evidence is needed to survive summary judgment.  <u>Winarto v. Toshiba Am. Elecs. Components, Inc.</u>, 274 F.3d 1276, 1284 (9th Cir. 2001).  But when the plaintiff relies on circumstantial evidence, that evidence must be "specific" and "substantial" to defeat a summary judgment motion.  <u>Id.</u>

If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action.  <u>EEOC v. Boeing Co.</u>, 577 F.3d 1044, 1049 (9th Cir. 2009).  If the defendant meets this burden, the plaintiff must then show a triable issue of material fact as to whether the defendant's stated reason is "mere pretext for unlawful discrimination."  <u>Hawn v. Exec. Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1155 (9th Cir. 2010).  If the defendant does so, the plaintiff must then show that the articulated reason is pretextual, by presenting direct or circumstantial evidence.  <u>Id.</u>

### 1.      Prima Facie Case

#### a)      *Direct Evidence*

Plaintiff contends that she has direct evidence supporting her claim of national origin discrimination based on Dr. Hakim's admission that he called Plaintiff "TW."  Pl.'s Opp'n at 8.  "Direct evidence is evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption."  <u>Dominguez-Curry v. Nev. Transp. Dep't</u>, 424 F.3d 1027, 1038 (9th Cir. 2005) (internal quotations and brackets omitted).  "'Direct evidence typically consists of *clearly* sexist, racist, or similarly discriminatory statements or actions by the employer.'"  <u>Id.</u> (quoting <u>Coghlan v. Am. Seafoods Co.</u>, 413 F.3d 1090, 1095 (9th Cir. 2005)) (emphasis added).  In other words, the evidence must show that the adverse action was taken *on account of* plaintiff's race or national origin.  <u>E.g.</u>, <u>Chuang v. Univ. of Calif. Davis</u>, 225 F.3d 1115, 1123 (9th Cir. 2000) (statement by state university

---

[2] To establish a prima facie case of discrimination in a Title VI case under the <u>McDonnell Douglas</u> test, the plaintiff must demonstrate: (1) membership in a protected class; (2) that she met the school's legitimate educational expectations; (3) an adverse education action; and (4) worse treatment than that of similarly situated students not in the protected class.  <u>See</u> <u>Brewer v. Bd. of Trustees. of Univ. Illinois</u>, 479 F.3d 908, 921 (7th Cir. 2007) (applying Title VII test to student's claims of discrimination under Title VI).

official that "two Chinks" in the pharmacology department were "more than enough," and dean's laughter in response constituted direct evidence of race and national origin discrimination in Title VII action brought by assistant professor of Chinese origin); Godwin, 150 F.3d at 1221 (comment that decision-maker "did not want to deal with another female" was direct evidence of sex discrimination); Cordova, 124 F.3d at 1149 (hiring manager's remarks that plaintiff was a "dumb Mexican" who had been hired because he was a minority was direct evidence of national origin discrimination).

In the instant case, the fact that Dr. Hakim called Plaintiff "TW" is not direct evidence of unlawful discrimination on account of her national origin. Unlike the references to "Chinks" or "Mexicans" in the aforementioned cases, there is no obvious nexus between "TW" or "Third World" and Plaintiff's Egyptian descent. As for the "third world dentistry" remark, Dr. Geissberger was referring to the work of Dr. Noble, as opposed to Plaintiff. Pl.'s Depo. at 427:17-429:24. Moreover, Plaintiff's allegation that being called "TW" is discriminatory and offensive is dubious given that Plaintiff referred to herself as "a.k.a. T.W." in emails she sent to both Dr. Hakim and Dr. Geissberger. Hakim Decl. Ex. Z; Geissberger Ex. X.

Even if "TW" related to Plaintiff's Egyptian origin, Plaintiff has failed to adduce any evidence linking said nickname to any adverse action by Defendants. The decision to extend Plaintiff's graduation date was *not* made by Dr. Hakim or Dr. Geissberger individually; rather, it was made by Dean Ferrillo upon the recommendation of the SAPPC. Bender Decl. ¶ 53 and Ex. F; Yarborough Decl. ¶ 11; LaBarre Decl. ¶ 15; Geissberger Decl. ¶ 22. There is no evidence that Dr. Geissberger or Hakim were responsible for the decisions made by the SAPPC or Dean Ferrillo. As such, Plaintiff cannot link the allegedly discriminatory conduct with the alleged harm. See Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996) (holding that a comment that is not directly tied to an adverse action is not direct evidence of discrimination). Thus, the Court concludes that Plaintiff has failed to present any direct evidence of national origin discrimination in support of her claim under Title VI.

*b)*     ***Circumstantial Evidence***

As an alternative matter, Plaintiff contends that even in the absence of direct evidence, she has indirect or circumstantial evidence that she was treated less favorably than similarly-situated IDS students.  Pl.'s Opp'n at 7-8.  Plaintiff argues that two other students (identified as Student 156 and 160) whose performance allegedly was similar to or worse than hers were allowed to graduate on time.  Pl.'s Opp'n at 9-10; Jambek Decl. ¶ 5 and Ex. E.  Specifically, Plaintiff claims that these students received low competency ratings in restorative dentistry, as well as negative comments, such as "not ready" and "should not graduate."  Jambek Decl. Ex. E at UOP1711, UOP2121, UOP490.  However, Plaintiff provides no context for these scores or comments, and, more importantly, has made no showing that these two IDS students were similarly-situated to her.  To the contrary, the record shows that they were not.  As of June 9, 2009, Plaintiff failed to pass seven of the twenty-one required tests in various areas of restorative dentistry.  Pl.'s Depo. at 335:9-25, 320:1-321:21, 389:18-390:25; 391:23-392:4.  Plaintiff admitted that she knew of no other IDS student in the 2009 graduating class who experienced that level of failure. Id. at 348:5-25.

Nor has Plaintiff raised a triable issue of fact as to her claim that she was treated differently than similarly-situated students who were extended for remediation.  Opp'n at 10.  Plaintiff alleges that of the four extended students, she was the only one required to report to specific instructors on specific days.  Id.  Whereas Plaintiff was required to meet with Dr. Geissberger and later Dr. Hakim on Tuesdays and Thursdays, other extended students were allowed to perform test cases with eight different instructors, Monday through Friday.  Id.  Plaintiff argues that as a result of this purported disparity, she "was exposed to only 25% of the professional judgment of the other student[s] and had to find patients for test cases and complete test cases in 40% of the days available to other students."  Opp'n at 11.

The flaw in Plaintiff's argument is, as above, that there is no showing that Plaintiff is similarly-situated to the other extended students.  In fact, there is no genuine dispute that

1   she is not similarly situated.  The Dean's letters to Plaintiff and the other students show that

2   each had unique requirements that had to be satisfied in order to qualify for graduation.

3   Compare Bender Decl. Ex. F (Plaintiff's extension letter) with Ex. G (extension letters to

4   Students 2, 6 and 12).  Despite Plaintiff's suggestions to the contrary, the other students

5   also had specific requirements as to the instructors assigned to review their test cases and

6   the days of the week on which those tests could be completed.  Id. Ex. G at UOP1325,

7   UOP0133.  Given the different graduation requirements imposed on each extended student

8   which were premised on the deficiencies and remediation needs unique to each student, the

9   fact that Plaintiff was subject to different limitations than other extended students is

10  inapposite, and fails to give rise to an inference of unlawful discrimination.  As Plaintiff has

11  failed to carry her burden of establishing a prima facie claim for national origin

12  discrimination, her claim under Title VI necessarily fails.

13  **2.**     **Legitimate, Non-Discriminatory Justification**

14       Even if Plaintiff had established a prima facie case of discrimination—which she has

15  not—Defendants have articulated legitimate, non-discriminatory reasons for their actions.

16  See Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (once a prima

17  facie case has been shown, "[t]he burden of production, but not persuasion, then shifts to

18  the employer to articulate some legitimate, nondiscriminatory reason for the challenged

19  action.").  The record shows that the University possessed objective and verifiable grounds

20  for concluding that Plaintiff had failed to satisfy the conditions for graduating in June 2009.

21  Drs. Geissberger and LaBarre and their respective departmental colleagues concluded that

22  Plaintiff lacked the requisite competency in removable prosthetics and restorative dentistry,

23  and therefore, was unqualified to graduate as scheduled.  Geissberger Decl. ¶¶ 10-13;

24  LaBarre Decl. ¶¶ 12-13. Their concerns were presented to the SAPPC, which concurred in

25  that assessment and recommended to the Dean that Plaintiff, along with three other

26  students, be offered extended student status in lieu of immediate graduation.  Bender Decl.

27  Exs. F, G.  The Dean accepted the SAPPC's recommendation and notified Plaintiff

28  accordingly.  Id. Ex. F.

During her extended period of training and evaluation, Plaintiff satisfactorily completed her additional instruction in removable prosthetics, but not in restorative dentistry.  Dr. Geissberger and four other faculty members from the Department of Restorative Dentistry evaluated Plaintiff's clinical work and found that she had not improved, and that her work was harming patients and placing them in danger.  Geissberger Decl. ¶ 25 and Exs. W, Y-EE; Hakim Decl. ¶ 17.  Notably, Plaintiff has produced no evidence to challenge the reasonableness of these faculty members' judgment, which is entitled to deference.  See Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 816 (9th Cir. 1999) (noting that "an educational institution's academic decisions are entitled to deference" because "courts generally are 'ill-equipped,' as compared with experienced educators, to determine whether a student meets a university's 'reasonable standards for academic and professional achievement.'") (quoting Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041, 1045 (9th Cir. 1999)).[3]  While Plaintiff generally disagrees with the Dean's decision to extend her graduation, she fails to proffer any specific evidence to controvert Defendants' showing that the University and the individual Defendants had legitimate, non-discriminatory reasons for extending Plaintiff's graduation and establishing specific milestones for her to meet to successfully complete the IDS program.

### 3.  Pretext

Finally, Plaintiff fails to raise a genuine issue of fact as to pretext.  Where the defendant presents legitimate reasons for the challenged action, "the burden shifts back to the [plaintiff] to demonstrate a triable issue of fact as to whether such reasons are pretextual."  Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 849 (9th Cir. 2004).  Evidence to show pretext must be both "specific" and "substantial" in order to overcome the articulated

---

[3] Plaintiff posits, without citation to any relevant authority, that the rule that academic institutions are entitled to deference only applies to due process claims.  Not so.  The rule applies to a school's evaluation of a student's academic performance in discrimination cases.  See Ikekwere v. Foothill-DeAnza Community College Dist., 441 Fed.Appx. 452 (9th Cir. 2011).

1   legitimate reasons put forth by the employer.  See Cornwell v. Electra Cent. Credit Union,

2   439 F.3d 1018, 1029 (9th Cir. 2006).

3       Plaintiff complains that in April 2009 she was informed by her faculty advisor Dr.

4   Giusti that she was "good to go" for graduation, and was never provided with any warnings

5   that she was not eligible to graduate on time until she received Dean Ferrillo's June 10,

6   2009 letter notifying of such.  Opp'n at 3, 9.  However, the record shows that warning

7   letters, which are typically disseminated in April, are not sent if the student has yet take the

8   requisite clinical tests.  LaBarre Decl. ¶ 19.  In Plaintiff's case, she was performing well

9   didactically, but she failed four of eleven clinical tests in restorative dentistry which she

10   waited to take until the eve of graduation.  Geissberger Decl. ¶ 16; Hakim Decl. ¶ 16;

11   Kachalia Decl ¶ 4; Kenyon Decl. ¶ 4; Pl.'s Depo. at 335:22-25, 337:19-338:4; 342:12-

12   343:22.  In addition, Plaintiff admitted during her deposition that she "truly did fail" these

13   tests because she "performed less than the competency level to pass the test[s]."  Pl.'s

14   Depo. at 391:23-392:4.  Accordingly, the lack of warning prior to June 2009 is inapposite.

15       Nor is the Court persuaded by Plaintiff's conclusory assertion that "Defendants

16   Geissberger and Hakim had to adopt a 'strategy' to conspire to end Plaintiff's career rather

17   than simply proceeding to attempt to remediate Plaintiff, if that ever was the goal."  Opp'n

18   at 11.  Plaintiff's unsupported contention is insufficient to show pretext.  See Steckl v.

19   Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983) (affirming summary judgment for

20   employer where the plaintiff "produced no facts which, if believed, would have shown

21   pretext and thus tendered an issue for trial."); see also Surrell, 518 F.3d at 1103

22   ("Conclusory statements without factual support are insufficient to defeat a motion for

23   summary judgment.").  But even if Drs. Geissberger or Hakim desired to "end" Plaintiff's

24   career and "had to adopt a 'strategy' to conspire" to do so, see Opp'n at 11, Plaintiff has

25   failed to adduce specific and substantial evidence that they did so and were motivated by

26   animus against persons of Egyptian descent.  Plaintiff herself admitted that she never heard

27   any Individual Defendant make any derogatory remarks about Egypt or Egyptians.  Indeed,

28   the record shows that IDS students from Middle-Eastern and Muslim countries timely

1  graduate at the same rate as other IDS students.  Bender Decl. ¶¶ 35-38 and Ex. I; LaBarre

2  Decl. ¶¶ 21-22.  In sum, the Court finds that Plaintiff has failed to demonstrate a triable

3  issue of material fact as to pretext.

4        **B.**     **SUPPLEMENTAL STATE LAW CLAIMS**

5        All of Plaintiff's remaining claims are based upon state law.  A district court may

6  decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has

7  original jurisdiction.  28 U.S.C. § 1367(c)(3); <u>Sanford v. MemberWorks, Inc.</u>, 625 F.3d

8  550, 561 (9th Cir. 2010).  "'[I]n the usual case in which all federal-law claims are

9  eliminated before trial, the balance of factors to be considered under the pendent

10  jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

11  toward declining to exercise jurisdiction over the remaining state-law claims.'"  <u>Sanford</u>,

12  625 F.3d at 561 (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988),

13  <u>superseded on other grounds by statute as recognized in</u> <u>Fent v. Okla. Water Res. Bd.</u>, 235

14  F.3d 553, 557 (10th Cir. 2000)).  Because the Court has granted summary judgment in

15  favor of Defendants with respect to Plaintiff's remaining federal claim, the Court declines

16  to assert supplemental jurisdiction over her pendent state law claims and dismisses said

17  claims without prejudice.  28 U.S.C. § 1367(c)(3); <u>City of Colton v. Am. Promotional</u>

18  <u>Events, Inc.-West</u>, 614 F.3d 998, 1008 (9th Cir. 2010) (holding that district court acted

19  within its discretion in declining to exercise supplemental jurisdiction over the pendent

20  state law claims after granting summary judgment on all federal claims).

21  **IV.**    <u>**CONCLUSION**</u>

22        For the reasons set forth above,

23        IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment is

24  GRANTED as to Plaintiff's claim under Title VI.  The Court declines to assert

25  supplemental jurisdiction over Plaintiff's remaining state law claims, which are dismissed

26  in accordance with 28 U.S.C. § 1367(c)(3).  The Clerk shall close the file.  All remaining

27  dates and deadlines in this action are VACATED.

28

1    IT IS SO ORDERED.

2    Dated: May 30, 2012

3                                                    SAUNDRA BROWN ARMSTRONG
                                                     United States District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28